## DAVIS, Director General of Railroads, v. TIMMONSVILLE OIL CO.

(Circuit Court of Appeals, Fourth Circuit.   December 21, 1922.)

No. 2054.

1. Carriers ☞100(1)—Demurrage charges are part of transportation charges, and must be collected to same extent.

Demurrage charges are part and parcel of the transportation charges, and are covered by the same rules of law; they are part of the tariff, and must be collected from the shipper or consignee of the freight to the same extent as the charge for carriage.

2. Carriers ☞100(1)—Consignee cannot refuse to pay demurrage charges after accepting and unloading cars, although shipments unauthorized.

That shipments to a consignee are unauthorized, and that the consignee does everything in its power to prevent the shipments, does not justify its refusal to pay demurrage charges, if it has accepted and unloaded the cars.

3. Carriers ☞100(1)—Failure to presently demand demurrage charges held not to estop carrier to sue therefor.

That a carrier, having tendered certain cars of cotton seed oil to a consignee, who was unable to receive them because of want of unloading facilities, failed to make present demand for payment of demurrage charges while the cars remained on its tracks, did not create an estoppel against the Director General of Railroads operating the carrier to bring action against the consignee to recover them, since as a carrier could not lawfully waive the charges directly, it could not do so by indirection; mistake, inadvertence, honest agreement, or good faith alike being, under such circumstances, unavailing.

4. Carriers ☞100(1)—Notice of constructive placement of cars held not so defective as to constitute a defense as against demurrage charges.

Where the unloading conveyor of an oil company had broken down, so that it was unable to unload shipments of cotton seed on the special delivery track, and the carriers immediately on arrival of certain cars of cotton seed oil consigned to the company, notified it by mail, giving the name of the railroad to which the cars belonged, their number, point of shipment, the name of the consignor, and the date of arrival, the failure of the notice to state also that the railroad was unable to make physical delivery of the car at the consignee's siding, because the track was blocked with other cars, did not invalidate the notice as notice of "constructive placement," required by Demurrage Rules, rule 5, § A, so as to constitute a defense in an action against the consignee for demurrage charges; the consignee already having the information omitted from the notice.

5. Carriers ☞100(1)—Neither carrier's negligence to collect, nor shipper's or consignee's failure to pay, constitutes a defense in an action for demurrage charges.

Neither the negligence of a carrier to collect demurrage charges, unless it continues beyond the statutory period of limitations, nor the failure of the shipper or consignee, however innocently done, to pay them, may be urged as a defense in an action by a carrier to recover such charges.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Action at law by James C. Davis, as Director General of Railroads and Agent of the United States Railroad Administration, against the Timmonsville Oil Company.   Judgment for defendant on a directed

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

verdict, and plaintiff brings error. Reversed, with instructions to grant new trial.

F. L. Willcox, of Florence, S. C. (S. M. Wetmore, of Florence, S. C., on the brief), for plaintiff in error.

R. E. Whiting, of Florence, S. C. (Whiting & Baker, of Florence, S. C., on the brief), for defendant in error.

Before WOODS and WADDILL, Circuit Judges, and GRONER, District Judge.

GRONER, District Judge. This is an action at law, brought by the Director General of Railroads against the defendant, an oil company located in Timmonsville, S. C., for the recovery of demurrage charges, amounting to $2,890, on a number of cars of cotton seed oil delivered to, and accepted by, the oil company during the month of October, 1918. At the conclusion of the evidence the District Judge directed a verdict for the defendant, and entered judgment on the verdict thus rendered. So much of the facts as are necessary to an understanding of the case are as follows:

The plant of the oil company was located on a special delivery track, with room for three cars at one time. Just prior to the arrival of the cars in question its unloading conveyor was broken, making it impossible to unload shipments of cotton seed. It at once notified the railroad, and requested that an embargo be placed on all shipments of seed to its mill, until it was in a position to handle the same, and likewise gave notice to its regular customers to discontinue shipments until notified. In spite of these precautions, however, shipments of a number of cars were made, accepted by the railroad, and, before the broken conveyor could be repaired, were received at Timmonsville. The usual post card notice of arrival was given by the railroad to the oil company, and these notices, presumably, were received by it in the regular course of mail. There being no room on the siding adjoining the mill property for more than three cars, the others were held in Timmonsville, on the tracks of the railroad company, on demurrage from date of arrival. After the repairs to the conveyor, and the resumption of operations, the cars were delivered on the siding to the oil company, accepted, unloaded, and released.

In directing a verdict for the defendant, the District Judge said:

"Ordinarily a consignee, by accepting and converting to its own use a shipment, accepts and becomes responsible for these transportation and demurrage charges; and in this case ordinarily the defendant would have been responsible after the acceptance and conversion to its own purposes of these shipments for the transportation and demurrage charges thereon, and should have deducted the amount of these demurrage charges, at least, if not the transportation charges, according to the contract of purchase, from the proceeds of the cotton seed to be by the defendant paid to the original shipper; and ordinarily he would be presumed at law to have accepted the shipment with these burdens, and to have, out of the proceeds of the cotton seed, protected himself against these demurrage charges against the shipment."

But he also held that the present case did not fall under the rule thus announced, because no demand was immediately made upon the defendant for the payment of demurrage charges, and that it, in good

faith, having subsequently settled with its customers without deducting these charges from the purchase price of the cotton seed, and without knowledge that it would itself be called upon by the carrier to pay them, the Director General is estopped, by reason of his negligence in not having sooner demanded the charges, from now looking to defendant for payment. In so holding we think the District Judge was in error.

[1-3] Demurrage charges are part and parcel of the transportation charges, and are covered by the same rules of law. They are a part of the tariff, and must be collected from the shipper or the consignee of the freight to the same extent as the charge for carriage. A penalty is imposed on the carrier for failure to collect (Union Pacific Ry. v. Goodridge, 149 U. S. 690, 691, 13 Sup. Ct. 970, 37 L. Ed. 986); the purpose of the law being, of course, to secure absolute equality between shippers. The fact that the shipments in this case were unauthorized, and the further fact that the oil company did everything in its power to prevent such shipments, would not, in our opinion, have justified its declining to pay the demurrage charges, if it accepted and unloaded the cars. It had presented to it the alternative of declining to accept the cars—in which event the railroad would have had a remedy by sale—or, having accepted them, to deduct the demurrage at the time of its remittances to consignors. The fact that the carrier failed to make present demand for such payment did not justify the assumption that the demurrage charges had been waived, for this the carrier could not legally do; nor does it, or can it, create an estoppel which would permit by indirection what may not lawfully be done directly. Mistake, inadvertence, honest agreement, or good faith are alike, under such circumstances, unavailing. The railroad and the shipper are both required to abide the public rate. New York, etc., R. R. v. York & Whitney, 215 Mass. 36, 102 N. E. 366. In the case last cited Chief Justice Rugg, speaking for the Supreme Judicial Court of Massachusetts, said:

"Estoppel against the collection of a rate fixed by rigid law cannot be predicated upon a statement or representation, which at most can be of no higher binding force than an express contract to the same effect honestly made by both parties would be. Such a contract would be of no avail in any aspect, because contrary to law."

And again:

"The regulation by Congress of interstate commerce rates takes that subject out of the realm of ordinary contract in some respects, and places it upon the rigidity of a quasi statutory enactment. The public policy thus declared supersedes the ordinary doctrine of estoppel, so far as that would interfere with the accomplishment of the dominant purpose of the act. It does not permit that inequality of rates to arise indirectly through the application of estoppel, which it was the aim of the act to suppress directly."

See, also, L. & N. R. R. v. Maxwell, 237 U. S. 94, 35 Sup. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665; Western Union Co. v. Esteve Bros., 256 U. S. 566, 41 Sup. Ct. 584, 65 L. Ed. 1094.

It would seem to us necessarily to follow that what the parties concededly may not do by acquiescence or by contract may not be done by implication, not accomplished by negligence, and that the lower

court was in error in applying the doctrine of estoppel under such circumstances.

[4] A further and additional ground of defense, apparently not considered by the District Court, but raised by defendant's answer, and insisted upon in the argument here, is that there was a failure of compliance by the Director General as to giving the notice of "constructive placement" required by rule 5, section A, of the Demurrage Rules, and that such failure operates to bar the running of demurrage until actual delivery of the cars. The rule is as follows:

"When delivery of cars consigned or ordered to any other than public delivery tracks or to industrial interchange tracks cannot be made on account of the act or neglect of the consignee, or the inability of the consignee to receive, delivery will be considered to have been made when the cars were tendered. The carrier's agent must send or give the consignee written notice of all cars he has been unable to deliver because of the condition of the private or interchange tracks, or because of other conditions attributable to consignee. This will be considered constructive placement."

As we have heretofore pointed out, the railroad, immediately upon arrival of the cars, respectively, mailed to the oil company notice of arrival. This notice, in substance, contained the name of the railroad to which the car belonged, the number of the car, the point of shipment, the name of consignor, and the date of arrival; but it is insisted that, because this notice did not also contain the information that the railroad was unable to make physical delivery of the car at the mill siding—because the track there was blocked with other cars, which the mill company was unable to unload because of the broken down condition of its machinery—it is a noncompliance with rule 5, and that there was, therefore, no "constructive" delivery of the cars.

The evidence discloses that the railroad siding which served the defendant's mill was capable of holding three cars and that the three cars first received after the breakdown were delivered on this siding and released by defendant on the 9th and 10th of October. Prior to this time the other cars had arrived at Timmonsville, and the defendant notified of this fact. It is therefore difficult to see what possible purpose notice of the inability of the railroad to make delivery to it on its siding would have accomplished. The cars had reached their destination, and although, by custom and agreement of the parties, the railroad assumed the duty of delivery upon the siding, such delivery, of course, could not be made until the siding was open to receive them. To have advised the defendant of this fact would have been merely to have given it information which it already possessed, and that this was not the purpose of the rule, we think, must be clear.

Formerly, no notice at all of the arrival of cars at destination was required to be given, and the giving of notice was a courtesy, or custom, with no binding obligation on the railroad. C. & O. Coal Co. v. Toledo, etc., 245 Fed. 917, 920, 158 C. C. A. 205. The quoted rule has corrected this omission, and imposes this obligation on the carrier, and in such a case as this the consignee might well be heard to insist that it was not chargeable with demurrage, if there had been a failure upon the part of the carrier to give it notice of the arrival of the cars. But when such notice was given, as is here conceded to have been the

case, and when, as is also conceded, the inclusion of the additional fact of inability to make delivery would have made no difference to the defendant, nor put it in any better position than it was, nor given it any information which it had not already at hand, the omission, we think, is inconsequential. To hold otherwise would be to create a defense against lawful charges, without the showing of any injury to sustain it.

[5] That this is a case of hardship, is apparent. That the defendant could and would have protected itself against loss, except for the unnecessary delay in presenting the demurrage bill by the carrier, we think equally clear; but that consideration cannot control the determination of this controversy. The duty of the carrier, the consignee, and the shipper is arbitrarily fixed, each is charged with notice of all that is thereby imposed, and neither the negligence of the carrier to collect the rate, unless such negligence continue beyond the statutory period of limitations, nor the failure of the shipper or consignee, however innocently done, to pay it, may be urged as a defense in an action for its recovery. The decision of the lower court, therefore, must be, and is, reversed, with instructions to grant a new trial in accordance with this opinion.

Reversed.